# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs November 18, 2009

## STATE OF TENNESSEE v. JEREMY A. JARVIS

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40800726      Michael R. Jones, Judge**

_____

### No. M2008-02711-CCA-R3-CD - Filed October 1, 2010

_____

Following a jury trial, Defendant, Jeremy A. Jarvis, was found guilty of the second degree murder of Willard Ross, a Class A felony; the attempted second degree murder of Jovan Dixon, a Class B felony; one count of reckless endangerment, a Class E felony; and one count of possession of a weapon with the intent to go armed, a Class A misdemeanor. The trial court sentenced Defendant as a Range I, standard offender, to twenty-five years for his murder conviction, twelve years for his attempted murder conviction, two years for his felony reckless endangerment conviction, and eleven months, twenty-nine days for his misdemeanor conviction. The trial court ordered Defendant to serve his sentence for attempted second degree murder consecutively to his sentence for second degree murder, and the remaining sentences concurrently with each other and with his sentence for second degree murder, for an effective sentence of thirty-seven years. On appeal, Defendant argues that the evidence is insufficient to support his convictions of second degree murder and attempted second degree murder. After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. Appeal as of Right; Judgments of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, (on appeal), and Thomas Overton, Nashville, Tennessee, (at trial), for the appellant, Jeremy A. Jarvis.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; Steven L. Garrett, Assistant District Attorney General; Christopher G. Clark, Assistant District Attorney General; and Robert J. Nash, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Rebecca Ross and the murder victim, Willard Ross, were married forty-one years before the shooting. Mr. Ross had taught in the Montgomery County school system for approximately forty years, and he had been a coach for approximately twenty-four years. Mr. Ross retired on June 25, 2006, exactly one year before the incident. Ms. Ross testified that she and her husband, along with other family members, sold fireworks during the summer from a tent in the parking lot of the Wal-Mart located on Ft. Campbell Boulevard in Clarksville.

Ms. Ross stated that at approximately 12:50 p.m. on June 25, 2007, Mr. Ross finished setting up a display of fireworks and walked over to Ms. Ross who was at the front of the tent. Mr. Ross and Ms. Ross stood next to each other looking out into the store's parking lot. Ms Ross heard "popping" sounds and thought at first that someone had set off some fireworks. She looked at her husband whose head jerked backwards. Mr. Ross turned toward Ms. Ross and she saw blood "gushing out of his mouth." Ms. Ross reached for Mr. Ross, and both of them fell to the floor. Ms. Ross called 911, but she was too upset to speak. A man took the cell phone from Ms. Ross and relayed the necessary information to the 911 operator. Ms. Ross said that the emergency personnel transferred her husband to Vanderbilt Hospital in Nashville by helicopter, where he died.

Dr. Tom Deering, an assistant medical examiner with Forensic Medicine Management Services, performed an autopsy on Mr. Ross. Dr. Deering testified that Mr. Ross died from a gunshot wound to the head. Dr. Deering said that the bullet entered the right lower lip area and exited from the lower left side of the back of the deceased victim's head. Dr. Deering said that the bullet broke some of the Mr. Ross's teeth and traveled to the left side of the neck where it struck the internal carotid artery and jugular vein.

James Eure, a police officer with the Clarksville Police Department, testified that he arrived at the fireworks tent at approximately 12:50 p.m. on June 25, 2007, in response to the dispatcher's call. Officer Eure described the scene as "chaotically crazy," and he began to clear the area so that the emergency personnel could assist Mr. Ross. Officer Eure identified several potential witnesses and separated them from the crowd into a secure location. From these witnesses, Officer Eure learned that an African-American man in a blue Pontiac with a white top and several African-American men in a black Ford Expedition had exchanged gunfire in the parking lot. One of the witnesses told Officer Eure that the driver of the Pontiac had bought a pack of cigarettes from a gas station near Wal-Mart shortly before the shooting. Officer Eure said that he reviewed the surveillance tapes of the gas station's

parking lot and identified a blue 1976 Pontiac Lemans with a white top and no hub caps. Officer Eure stated that he was familiar with the vehicle because of its unusual characteristics. Officer Eure said that the owner of the Pontiac was Jevon Dixon. (Mr. Dixon was also charged with Defendant in the same indictment, but his case was severed from Defendant's prior to trial).

Kim Mercado testified that she is employed by Wal-Mart in the loss prevention security department. After the shooting on June 25, 2007, Ms. Mercado pulled the surveillance tapes of the store's parking lot for the time period between approximately 12:00 p.m. until shortly after 1:00 p.m. Copies of the tapes were introduced as exhibits at trial without objection. The final videotape shows Mr. Dixon's blue Pontiac pull out of a parking spot and drive straight toward the fireworks tent. People exited a nearby Ford Expedition. The Pontiac continued to travel down the row and then veered suddenly to the right. From an aerial map of the parking lot, Ms. Mercado identified the location where the black Ford Expedition and the older blue vehicle had been parked as observed on the surveillance tape.

Stephanie Wendland testified that she heard gunshots as she exited Wal-Mart on June 25, 2007. Ms. Wendland stated that she observed an African-American man standing near the driver's side of a black Ford Expedition fire a gun over the top of the Expedition at the driver of a blue vehicle. Ms. Wendland said that the shooter was firing in the direction of the fireworks tent as the Pontiac drove away. Ms. Wendland said that the people in the Expedition did not immediately drive away but stayed in the parking lot for approximately five minutes. On cross-examination, Ms. Wendland stated that she heard more than three gunshots, but she did not know if all of the gunshots were fired from the Expedition.

Carmen Moore also heard gunshots as she exited Wal-Mart on June 25, 2007. Ms. Moore testified that she saw a large black vehicle with tinted windows speed out of the parking lot. On cross-examination, Ms. Moore said that she also saw a blue car in the parking lot.

Sandra Simpson testified that she heard a gunshot on June 25, 2007, as she was putting her groceries in the trunk of her car. Ms. Simpson said that she heard a second bullet go past her face and ducked down. Ms. Simpson personally knew Mr. Ross, and she looked toward the fireworks tent. Ms. Simpson saw Mr. Ross drop to the ground, and she knew that he had been shot. Ms. Simpson stated that a large black SUV drove past her. A man had his arm stuck out of the vehicle's window holding a large gun. Ms. Simpson said that the arm was pulled back into the vehicle, and the window was rolled up. Ms. Simpson stated that a "blue-green" vehicle drove past her. The vehicle veered to the right and drove away from the fireworks tent. Ms. Simpson said that she heard approximately five gunshots.

On cross-examination, Ms. Simpson said that the black vehicle drove past her first. Ms. Simpson said that her statement to the investigating officers after the incident that both vehicles were stopped was incorrect. Ms. Simpson acknowledged that her statement did not mention seeing a gun held out of the black vehicle's window. Ms. Simpson said that the blue vehicle was driving toward her when she heard the second bullet pass by her head. Ms. Simpson stated that she could not identify any of the occupants of the two vehicles.

Eboney Harrell testified that she arrived at Wal-Mart on June 25, 2007, at approximately 1:00 p.m. Ms. Harrell pulled into the parking lot and stopped for traffic. Ms. Harrell said that a blue vehicle drove past her in the direction of the fireworks tent, and an African-American man jumped out of the driver's side backseat of a black Ford Expedition. The man looked around for "a couple of seconds," and then started firing his gun toward the blue car. Ms. Harrell heard approximately seven gunshots. Ms. Harrell yelled at the shooter, "What are you doing." The shooter responded, "He shot at me first." Ms. Harrell asked the man, "Does that make it right?" Ms. Harrell stated that the man just kept repeating, "he shot at me first." Ms. Harrell parked her car but the Ford Expedition drove out of the parking lot before she could talk further with the man. On cross-examination, Ms. Harrell acknowledged that she did not know if all of the gunshots were fired by the man in the Expedition.

William Coleman testified that Charles Mitchell picked him up on June 25, 2007, in a black Ford Expedition. Mr. Coleman stated that Mr. Mitchell's wife, Evelyn Harris, was in the front passenger seat, Defendant was sitting in the back behind Mr. Mitchell, and a man Mr. Coleman knew only as "Jerrigan" was sitting in the middle of the back seat. Mr. Coleman got into the backseat behind Ms. Harris. Mr. Mitchell drove to Wal-Mart and pulled into a parking space. Ms. Harris went into the store, and the rest of the group waited in the vehicle. Mr. Coleman said that a man, later identified as Mr. Dixon, was exiting the store as Ms. Harris was entering, and Mr. Dixon stared at Ms. Harris. Defendant rolled his window half-way down and yelled to Mr. Dixon that Ms. Harris was "already taken."

Mr. Coleman stated that Mr. Dixon kept staring at the group in the Expedition as he walked toward them. Defendant, Mr. Mitchell, Jerrigan and Mr. Coleman got out of the Expedition. Mr. Dixon sat down in his vehicle, started the ignition, and "cruise[d] out just a little bit." Jerrigan asked Mr. Dixon, "Hey, n____, you got a problem?" Mr. Dixon replied, "No, n___, you got a problem." Mr. Dixon then raised a gun up and fired at the group. Mr. Coleman ducked down. He heard three shots in succession, and then after approximately two seconds, five to six more shots. After the shooting stopped, Mr. Coleman stood up and saw people running through the parking lot and heard a woman scream.

Mr. Coleman said that he tried to explain to a Wal-Mart employee in the parking lot that the man in the blue Pontiac had opened fire first, but the employee did not seem to

understand. Another employee ran up, and again Mr. Coleman explained that the man in the blue Pontiac had fired first. Mr. Coleman said that at that point, the group decided "to split from the situation." Mr. Mitchell drove to a nearby grocery store and dropped off Defendant and Mr. Coleman. Melissa Sowell, Defendant's friend, picked up Mr. Coleman and Defendant, and then drove back to Wal-Mart to get Ms. Harris. Ms. Sowell took Defendant to his house and Mr. Coleman to his mother's house.

Mr. Coleman stated that he did not see Defendant with a gun that afternoon. He then said that Defendant "might have had something in his pocket," but he did not know for sure if it was a gun. Mr. Coleman said, "I can say I seen [sic] a black handle or something like that, but how can I just call it a gun?" Mr. Coleman denied that he told the prosecutor prior to trial that he saw Defendant put a gun back in his pocket after Defendant got back into the vehicle. On cross-examination, Mr. Coleman said that none of the group knew Mr. Dixon, and everyone, including Defendant, was scared when the shooting began.

Jennifer Gipson, a detective with the Clarksville Police Department, testified that the following items were found in the parking lot and the fireworks tent: five .40 caliber shell casings between rows eight and nine; three 9 mm shell casings in rows eight and nine; two bullet fragments and one projectile inside the fireworks tent; bullet fragments in and on a cardboard box at the entrance of the tent; and a bullet fragment in row eight. On cross-examination, Detective Gipson stated that the .40 caliber shell casings were located closer to the store while the 9 mm shell casings were located closer to the fireworks tent.

Brad Crowe, a detective with the Clarksville Police Department, testified that the projectile found inside the fireworks tent was approximately four hundred feet from the cluster of .40 caliber shell casings in the parking lot. Detective Crowe processed Mr. Dixon's Pontiac. A bullet strike was found in the area of the rear window, and a 9 mm shell casing was found inside the vehicle in the passenger side back seat. A Bryco Jennings 9 mm handgun was found in Mr. Dixon's house during the execution of a search warrant. On cross-examination, Detective Crowe stated that a 9 mm Ruger P95 and a Rock Island .45 revolver were also found in the house.

Gary Hodges, a detective with the Clarksville Police Department's crime scene unit, testified that he photographed a black Ford Expedition which had two bullet strikes. One strike was located above the latch that opened the trunk, and the second strike was underneath the right rear of the vehicle.

Special Agent Dan Royse, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that the five .40 caliber shell casings found at the scene were fired from the same Glock semi-automatic pistol. Special Agent Jennings stated that the 9

mm shell casings found in the Wal-Mart parking lot and in the back seat of the blue Pontiac were all fired from the Bryco Jennings 9 mm pistol. Special Agent Jennings said that the .40 caliber projectile that struck the Pontiac and the bullet fragments found in the fireworks tent had the same characteristics as bullets fired from a .40 caliber Glock pistol. Special Agent Jennings stated that there was no evidence from the crime scene that indicated the use of the 9 mm Ruger during the shooting. Special Agent Jennings said that none of the ballistics or firearms evidence found in the fireworks tent was linked to the Brico Jennings 9 mm pistol.

Alan Charvis, a detective with the Clarksville Police Department, interviewed Defendant two days after the shooting. A videotape of the interview was introduced as an exhibit and played for the jury. Defendant said that on June 25, 2007, he rode to Wal-Mart in a black Ford Expedition driven by Mr. Mitchell. Mr. Coleman and a man named Jerrigan were also in the vehicle. Mr. Mitchell parked close to the store, and the men sat in the vehicle talking. Defendant said that a light-skinned African-American man exited the store and walked toward the Expedition. The man kept staring at the Expedition as he walked toward them. The man said something to the group, but Defendant could not hear what he said. The man sat down in a blue car and started the ignition. Still staring at the Expedition, he pulled out a gun and began firing. Defendant stated that he was standing next to the Expedition when the man discharged his weapon, and that he was "close to" getting shot. Defendant reached inside the Expedition for his gun and "retaliated back." Defendant stated that he fired four times and then got back into the Expedition. A Wal-Mart employee ran up to the Expedition and asked what had happened. Defendant said that he tried to explain to the man, but the man did not seem to understand. Defendant heard people screaming, and the group drove out of the parking lot.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions for the second degree murder of Mr. Ross, and the attempted second degree murder of Mr. Dixon. Defendant acknowledges that he discharged his gun in the Wal-Mart parking lot on June 25, 2007, and that Mr. Ross was killed as a result of the exchange of gunfire. Defendant submits, however, that he only fired his weapon because he was fired upon first. Defendant contends that his conduct and the circumstances surrounding the shooting was at best only criminally negligent. Alternatively, Defendant argues that at most he should be found guilty of voluntary manslaughter because he and Mr. Dixon were engaged in "mutual combat" which adequately provoked that shooting.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-13-302(b). A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39-12-101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id*. § 39-12-101(b).

Defendant did not include the jury instructions in the record on appeal. *See* Tenn. R. App. P. 24(b) (placing the duty to prepare an adequate record for appellate review on the appealing party). Nonetheless, based on the discussions between the trial court and counsel which are included in the record, as well as counsel's closing argument, it is apparent that the trial court charged the jury with the lesser included offenses of voluntary manslaughter and criminally negligent homicide.

"Criminally negligent conduct which results in death constitutes criminally negligent homicide." T.C.A. § 39-13-212. A person acts with criminal negligence

> with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the

standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused's person's standpoint.

*Id*. § 39-11-202(d). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. § 39-211(a).

Thus, the difference between criminal negligence and second degree murder is that criminally negligent homicide has a lesser level of culpability. *See State v. Ely*, 48 S.W.3d 710, 720 (Tenn. 2001). Second degree murder and voluntary manslaughter have the same mental state of knowing, but a voluntary manslaughter conviction depends on the existence of adequate provocation. "Whether the act constitutes a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); *see also State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001).

Viewing the evidence in a light most favorable to the State, Defendant, Mr. Coleman, Mr. Mitchell, Ms. Harris and "Jerrigan" drove to Wal-Mart at approximately 1:00 p.m. on June 25, 2007. Defendant was armed at the time. Ms. Harris entered the store as Mr. Dixon was exiting. There was a verbal confrontation with Mr. Dixon, and racial slurs were exchanged. Mr. Dixon sat down in his blue Pontiac and started the ignition. Defendant exited the Expedition. Mr. Dixon pulled out a gun and began firing as he drove away. Defendant ducked down and then reached inside the Expedition for his weapon. Defendant fired several shots at the Pontiac as it drove toward the fireworks stand through the crowded parking lot.

Based on our review, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant knowingly, and not with criminal negligence, fired his weapon at Mr. Dixon in the direction of the fireworks tent where Mr. Ross was standing. *See Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999) (holding that if a defendant knowingly fires his weapon at a specific person, and an innocent bystander is killed, the element of intent as to the criminal liability for the death of the bystander is satisfied).

Although mutual combat is not a statutory defense, "the facts and circumstances surrounding the killing occasioned by mutual combat may establish that the defendant was impassioned as a result of adequate provocation." *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001). The jury heard evidence and considered Defendant's theory of defense that he was provoked into engaging in gunfire with Mr. Dixon. Viewing the evidence again in a light most favorable to the State, a hostile verbal exchange occurred between Mr. Dixon and the men in the Expedition in the parking lot immediately prior to the shooting. Mr.

Dixon sat down in his car, pulled out a gun, shot at the Expedition, and then drove away. Instead of getting back into the Expedition and leaving the area, Defendant reached into the Expedition, pulled out his gun, and fired several shots toward the retreating Pontiac in a parking lot crowded with shoppers. Defendant and his group remained in the parking lot after the shooting and tried to explain to the bystanders that the shooting was not Defendant's fault.

The jury was given the option of voluntary manslaughter as a lesser included offense and chose to reject the notion of provocation which was well within its prerogative. Based on our review, we conclude that the evidence is sufficient beyond a reasonable doubt to support Defendant's conviction of the second degree murder of Mr. Ross and the attempted second degree murder of Mr. Dixon. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE